1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUL ARELLANO,<br>CDCR #AH-1995,<br><br>                              Plaintiff,<br><br>vs.<br><br>Dr. MICHAEL BALBIN SANTOS,<br><br>                              Defendant. | Case No.:  3:18-cv-02391-BTM-WVG<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO Fed. R. Civ. P. 56**<br><br>**[ECF No. 75]** |

Plaintiff Raul Arellano, currently incarcerated at Richard J. Donovan Correctional Facility ("RJD") in San Diego, California, and proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, on October 18, 2018. *See* Compl., ECF No. 1.[1] Plaintiff claims Michael Balbin Santos, a doctor at RJD, violated his First and Eighth Amendment rights by tapering his dosage of Gabapentin—a  medication he contends was previously prescribed to treat both his neuropathic pain and seizures—and later

---

[1] Throughout this Order and for ease of consistency and reference, the Court will cite to each document in the record using both the number assigned to the document and the page number automatically generated by its Case Management/Electronic Case File system ("ECF").

threatening to terminate the prescription altogether if he continued to complain about the dosage. *See id.* at 3–4.

## I.  Procedural History

Plaintiff is proceeding in forma pauperis, and his repeated motions requesting that the Court grant him preliminary injunctive relief requiring Dr. Santos to renew and increase his dosage of Gabapentin have been denied. *See* ECF Nos. 6, 10, 13, 40, 49, 52. Nevertheless, the inadequate medical care and retaliation claims alleged in his Complaint have survived Defendant Santos's efforts to dismiss them pursuant to Fed. R. Civ. P. 12(b)(6). *See* ECF No. 26. Santos now seeks summary judgment pursuant to Fed. R. Civ. P. 56. *See* ECF No. 75.

The Court has provided Plaintiff with notice of the requirements for opposing summary judgment as required by *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland,* 154 F.3d 952 (9th Cir. 1998) (en banc). *See* ECF No. 76. After he was granted two extensions of time, *see* ECF Nos. 82, 84, Plaintiff filed his Opposition on August 3, 2021. *See* ECF No. 88. On August 11, 2021, Defendant filed his Reply. *See* ECF No. 89.

Having now carefully considered the full record as submitted, the Court finds Defendant Santos is entitled to judgment as a matter of law with respect to both Plaintiff's First and Eighth Amendment claims, GRANTS Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (ECF No. 75) and DIRECTS the Clerk to enter judgment accordingly.

## II.  Defendant's Motion for Summary Judgment

### A.  Standard of Review

A court may grant summary judgment when it is demonstrated that there exists no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The party seeking summary judgment bears the initial burden of informing a court of the basis for its motion and of identifying the portions of the declarations,

pleadings, and discovery that demonstrate an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. *See Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).

If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." *Id.* But if the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine dispute as to any material fact actually exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party cannot "rest upon the mere allegations or denials of [its] pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." *See Estate of Tucker*, 515 F.3d 1019, 1030 (9th Cir. 2008) (internal quotation marks and citation omitted).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before a court must be drawn in favor of the opposing party. *See Stegall v. Citadel Broad, Inc.*, 350 F.3d 1061, 1065 (9th Cir. 2003). However, "[b]ald assertions that genuine issues of material fact exist are insufficient." *See Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007); *see also Day v.*

*Sears Holdings Corp.*, No. 11–09068, 2013 WL 1010547, *4 (C.D. Cal. Mar. 13, 2013) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). A "motion for summary judgment may not be defeated ... by evidence that is 'merely colorable' or 'is not significantly probative.'" *Anderson*, 477 U.S. at 249–50 (citation omitted); *see also Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2006). If the nonmoving party fails to produce evidence sufficient to create a genuine dispute of material fact, the moving party is entitled to summary judgment. *See Nissan Fire & Marine*, 210 F.3d at 1103.

   B.   Plaintiff's Medical History & Treatment Record[2]

Plaintiff claims to suffer from hypertension, diabetes, partial and tonic-clonic seizures, and ongoing pain due to neuropathy and nerve damage to his head and lower back caused by an "excessive force incident" in 2010, a fall from his bunk in 2012, and a suicide attempt in April 2018. *See* ECF No. 1 at 3; Pl.'s Decl. in Supp. of TRO, ECF No. 3 at 2–3; Pl.'s Dep., Def.'s Ex. 1 in Supp. of Mot. for Summ. J., ECF No. 75-4 at 4–5.

---

[2] Plaintiff's Complaint provides a summary of his claimed constitutional violations, but he expressly incorporates by reference more detailed factual allegations included in a Declaration attached to his motion for a TRO. *See* ECF No. 1 at 3 ("The 8th Amendment violation is all emphasized in the attached Declaration. Here is just a summary of the violation."); *id.* ("For the reasons above as what I wrote on Declaration is sufficient to pas[s] the level of state a claim."); *see also* ECF No. 3 at 2–8; 9–24. In his Opposition to Defendant's Motion for Summary Judgment, Plaintiff further "declares under penalty of perjury that everything stated [in] [his] Complaint is true and correct." *See* ECF No. 88 at 28. "A verified complaint may be treated as an affidavit to oppose summary judgment to the extent it is 'based on personal knowledge' and 'sets forth specific facts admissible in evidence.'" *Keenan v. Hall*, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996) (quoting *McElyea v. Babbitt*, 833 F.2d 196, 197–98 n.1 (9th Cir. 1987) (per curiam)), *amended by Keenan v. Hall*, 135 F.3d 1318 (9th Cir. 1998); *see also Schroeder v. McDonald*, 55 F.3d 454, 460 & nn. 10–11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification was not in conformity with 28 U.S.C. § 1746, he stated under penalty of perjury that its contents were true and correct, and his allegations were based on personal knowledge).

Defendant does not dispute Plaintiff suffers from diabetic neuropathy and has complained of seizures since 2010, but he does not attribute them to any particular cause or incident and claims the "type of seizure[s]" Plaintiff attests to suffer have "never been witnessed by medical staff," remain undiagnosed, and have not been confirmed by subsequent EEGs, MRIs, or CT scans of Plaintiff's brain. *See* ECF No. 75-4 at 4, 6, 14–15, 51–53; Def.'s June 8, 2020 Decl. in Response to Pl.'s 2d Mot. for TRO, ECF No. 36-2 at 2, 3, 4 ¶¶ 3, 10, 12; Def.'s Dec. 12, 2018 Decl. in Response to Pl.'s 1st Mot. for TRO, ECF No. 8-1 at 4 ¶ 9.

For these ailments, from 2011 through 2015, Plaintiff was nevertheless prescribed a host of antiepileptic drugs including Keppra, Dilantin, Lamictal, Depakote, Tegretol, and Lyrica,[3] together with various types of pain medications including Naproxen,

---

[3] According to the Physician's Desk Reference ("PDR"), Keppra® is a brand name for levetiracetam. *See* https://www.pdr.net/drug-summary/Keppra-Oral-Solution-and-Tablets-levetiracetam-1054.6058 (last visited Sept. 9, 2021). It is an "oral and intravenous pyrrolidine derivative antiepileptic drug" "[u]sed for the treatment of certain types of partial, myoclonic, and generalized tonic-clonic seizures," and requires "[m]onitor[ing] for emerging or worsening suicidal thoughts/behavior and depression." *Id.* Dilantin® is a brand name for phenytoin sodium. It is an "[o]ral and parenteral hydantin anticonvulsant with narrow therapeutic window; used for tonic-clonic seizures and complex partial seizures; switching dosage forms may produce significant changes in serum concentrations; close monitoring for emerging or worsening suicidal thoughts/behavior or depression is recommended." *See* https://www.pdr.net/drug-summary/ Dilantin-Capsules-phenytoin-sodium-1813 (last visited Sept. 9, 2021). Lamictal® is the brand name for lamotrigine, an "[o]ral antiepileptic drug (AED) … [u]sed for adjunctive therapy for partial-onset seizures, primary generalized tonic-clonic seizures, [] generalized seizures of Lennox-Gastaut syndrome; … [and] maintenance treatment of bipolar I disorder." *See* https://www.pdr.net/drug-summary /Lamictal-lamotrigine-206.3731#3 (last visited Sept. 9, 2021). Pregabalin (Lyrica®) is the CCHCS's recommended formulary medication for the treatment of diabetic neuropathy and partial seizures. *See* Def.'s Ex. 2, ECF No. 75-4 at 112. The Court may take judicial notice of medical facts regarding prescription drugs, their active ingredients and effects as described in the PDR. *See United States v. Howard*, 381 F.3d 873, 880 & n.7 (9th Cir. 2004) (taking judicial notice of the narcotic effects of Percocet and Percodan noted in PDR); *see also Lolli v. County of Orange*, 351 F.3d 410, 419 (9th Cir. 2003) ("Well-known medical facts are the types of matters of which judicial

Ibuprofen, Amitriptyline (Elavil®), and Sulindac, but he claims they all caused "severe side effects" and proved ineffective. *See* ECF No. 3 at 2; ECF No. 75-4 at 5–6, 9, 12, 39–40; Pl.'s Opp'n to Mot. for Summ. J., ECF No. 88, Ex. A, at 30–43.[4]

In late 2015 and early 2016, Plaintiff was prescribed Depakote and a "low dose" or 300 mg of Gabapentin three times a day, which he alleges is "for both pain/seizure[s]." ECF No. 3 at 2; ECF No. 75-4 at 15–16; ECF No. 88, Ex. A at 38.[5]

---

notice may be taken.") (quoting *Barnes v. Indep. Auto. Dealers Ass'n of Cal. Health & Welfare Benefit Plan*, 64 F.3d 1389, 1395 n.2 (9th Cir. 1995)).

[4] Plaintiff filed eight other civil rights actions in the Southern District of California between March 13, 2014, and the filing of this case on October 28, 2018. *See* https://pcl.uscourts. gov/pcl/pages/search/results/parties.jsf?sid=bb8b2ef241c64377b259b64606c339dd (last visited Sept. 9, 2021). Seven of those cases remained pending at the time Plaintiff filed this action, and four of them contain Eighth Amendment inadequate medical care allegations related to pain medication. However, all of Plaintiff's previously filed claims arose years before the incidents at issue in this case, and all name different RJD doctors, nurses, and inmate appeals officials as Defendants. While similarly based on his Eighth Amendment right to adequate medical care, none are duplicative of the claims Plaintiff alleges against Dr. Santos in this matter, which Plaintiff contends first arose at RJD in May 2018. *See* ECF No. 1 at 1, 3-4; *cf. Arellano v. Hodge, et al.,* S.D. Cal. Civil Case No. 3:14-cv-00590-JLS-JLB; *Arellano v. Sedighi, et al.*, S.D. Cal. Civil Case No. 3:15-cv-02059-AJB-BGS; *Arellano v. Melton, et al.*, 3:15-cv-02069-JAH-NLS; and *Arellano v. Dean, et al.*, 3:15-cv-02247-BEN-JLB.

[5] Depakote® is the brand named for divalproex sodium. It is an "[a]nticonvulsant available orally," "[u]seful for absence, myoclonic, partial and tonic-clonic seizures; treats bipolar disorder and agitation secondary to dementia." "Close monitoring for emerging or worsening suicidal thoughts/behavior or depression is recommended." *See* https://www. pdr.net/drug-summary/Depakote-ER-divalproex-sodium-10.8467 (last visited Sept. 9, 2021). Gabapentin (Neurontin®) is prescribed for "restless legs syndrome, postherpetic and other neuralgias, and adjunctively for partial seizures." Prescriptions must also be "[m]onitor[ed] for emerging or worsening suicidal thoughts or actions and/or depression." https://www.pdr.net/drug-summary/Neurontin-gabapentin-2477.4218 (last visited Sept. 9, 2021); *see also* "CCHCS Care Guide: Pain Management Part 2- Therapy-Non-Opioid," Def.'s Ex. 2, ECF No. 75-4 at 112 (classifying Gabapentin as non-formulary and appropriate for consideration only in "cases with objective evidence of severe neuropathic pain after documented trials of 1st and 2nd line agents (TCA [Tricyclics], SNRI [serotonin

1    While Plaintiff claims to have still suffered seizures in 2016, he noticed that as

2    "they (different doctors) increased [the] Gabapentin," his seizures decreased in both

3    frequency and severity. *See* ECF No. 3 at 2. By "May or so of 2017," Plaintiff's

4    Gabapentin dosage had been increased to 2700 mg, which he contends "was controlling

5    [his] seizures," and he "stayed on that level for a year." *Id.*; *see also* ECF No. 75-4 at 12–

6    13, 15–16.

7    Defendant Santos attests, however, that "Gabapentin was prescribed for

8    [Plaintiff's] complaints of neuropathic pain, not for seizures." *See* ECF No. 8-1 at 2 ¶ 3;

9    *see also* ECF No. 88, Ex. A at 33 (Jan. 6, 2016 Medical Progress Note requesting a

10   "switch" from Lyrica-Sulindac to non-formulary Neurontin to control Plaintiff's "low

11   back pain with radiculopathy" and an "MRI if Neurontin does not control his pain.");

12   ECF No. 88, Ex. G at 85 (April 15, 2016 Medical Progress Note increasing daily

13   Gabapentin dose to 1500 mg in response to Plaintiff's complaints of "chronic pain with

14   numbness and tingling going down his arms and legs"); *id.* at 83 (June 16, 2016 Medical

15   Progress Note increasing Plaintiff's daily dose of Gabapentin from 1500 mg to 1800 mg

16   for complaints of "chronic low back pain").

17   Dr. Malhotra, who was Plaintiff's neurologist in 2016, continued to prescribe

18   Depakote to treat Plaintiff's seizures; however Malhotra also noted those seizures were

19   "presumed" and "unwitnessed." *See* ECF No. 8-1 at 2 ¶ 3 & Ex. A at 7. Included in

20   Malhotra's Progress Record is further documentation of a "normal" EEG and "no

21   indication for Neurontin (Gabapentin)." *See id.*; *see also* ECF No. 75-4 at 11. Plaintiff

22   admits he has had multiple x-rays of his cervical and thoracic spine, three EEG's, MRIs

23

24

25   _____

26   norepinephrine reuptake inhibitors])," and noting "only FDA indications for Gabapentin

27   [as]: partial onset seizures (adjunct) [and] post herpetic neuralgia (PHN)," adverse effects
     including "dizziness, cognitive impairment, fatigue, nausea and vomiting headache," and

28   advising "caution in patients with … suicidal behavior and ideation.").

of his lumbar spine, and a CT scan, and that "they all c[a]me back normal." ECF No. 75-4 at 14–15; *see also* ECF No. 88, Ex. B, at 45–53.

Santos attests that by November 2017, another of Plaintiff's primary care physicians continued him on "900 mg of Gabapentin three times a day, resulting in a daily dosage of 2700 mg." *See* ECF No. 8-1 at 2 ¶ 3. Plaintiff contends this "combination of Gabapentin and Depakote" "was more effective with less side effects." *See* ECF No. 75-4 at 16. However, even while Plaintiff remained on a daily dose of 2700 mg of Gabapentin, "his complaints of pain continued." ECF No. 36-2 at 2 ¶ 4; ECF No. 75-4 at 16–17.

Specifically, on January 31, 2018, Plaintiff submitted CDCR 602 Health Care Grievance, Tracking # RJD HC 1800120, noting an increase in his chronic head, back, and neck pain, and an inability to sleep due to nausea, burning and numbness he attributed to his peripheral neuropathy. *See* ECF No. 75-4, Ex. 2 at 65–66. Plaintiff was provided a MRI, but objected on grounds that he instead needed "stronger pain meds." *Id.* at 66. On February 9, 2018, Plaintiff filed another CDCR 602 Health Care Grievance, Tracking # RJD HC 18000997, repeating his claims of persistent pain due to back injury and insufficient medication "to effectively calm" his "neuropathy pain." *Id.*, Ex. 3 at 67–69. Plaintiff admitted he had "tried out many different types of medications," and "went through Amitriptyline, Lyrica, and now Gabapentin," but needed an "upgrade of Gabapentin" specifically because he had "developed a tolerance" to it. *Id.* at 69; *see also* ECF No. 3 at 3.

Dr. Santos was assigned as Plaintiff's primary care physician from March 22, 2018 through October 25, 2018, but did not evaluate him until after he was released from a mental health crisis bed on April 20, 2018. *See* ECF No. 36-2 at 2 ¶ 2; ECF No. 75-4 at 22, 26 & Ex. 4 at 70. Plaintiff was admitted to the infirmary for approximately 30 days after he "thr[ew] [him]self [from] the top bunk head first," and cut his wrists due to a "family tragedy." *See* ECF No. 3 at 3; ECF No. 75-4 at 26.

Plaintiff claims to have sustained a concussion, temporary blindness, and "permanent blurry vision" as a result of this incident, and was prescribed Tylenol with codeine ("T3") for pain while he remained in the suicidal infirmary. *See* ECF No. 3 at 3; ECF No. 75-4 at 25–26. On April 28, 2018, Plaintiff filed another CDCR 602 Health Care Grievance, Tracking # RJD HC 18001627, claiming his psychologist, Dr. Calderon, had discharged him prematurely, and that he had new "numbness" and "severe" pain in his wrists, and repeating his prior requests for "stronger pain meds." *See* ECF No. 75-4, Ex. 4 at 70.

After his release, Plaintiff met with Dr. Santos on May 7, 2018. *See* ECF No. 3 at 3; ECF No. 75-4 at 26–27. Plaintiff reported the neck and wrist injuries he had just sustained as a result of his suicide attempt were so severe they were interfering with his ability to walk, exercise, breathe, and sleep. *See* ECF No. 3 at 3. Plaintiff also reported the Gabapentin he had previously been prescribed "seem[ed] to alleviate" these issues, but he requested an increased dosage—specifically one to alleviate his pain "during the long period of 8 p.m. to 9 a.m."—noting that "when this happens the doctors upgrade [his] Gabas because his body had gotten used to it." *Id.* Plaintiff also "named all the other pain medication [he had] been on" and claimed those were "ineffective" and caused side effects that "put [his] health and life at risk." *Id.*

Instead of increasing Plaintiff's Gabapentin prescription, however, Dr. Santos decreased his dosage by 300 mg per day to 2400 mg, and added 1000 mg of Salsalate twice a day "to help control his pain." *See* ECF No. 8-1 at 2 ¶ 4; ECF No. 3 at 3; ECF No. 75-4 at 27.

On May 10, 2018, Plaintiff filed a Health Care Services Request Form ("CDC 7362") claiming an emergency and again describing his cervical and neuropathic pain as so severe it was interfering with his breathing. *See* ECF No. 88 at 71. On May 11, 2018, however, Plaintiff was evaluated by a Registered Nurse ("RN") who noted he was "ambulatory with a steady gait," "smiling, talking, and laughing," and acknowledged that if "[he] didn't put pain with difficulty breathing, [he] won't be seen at the same day." *Id.*

at 70. Plaintiff reported "lower back pain 8/10 and [that] it was getting worse during the night," asked for his T3 to be renewed, and to "discuss [his] concern with Dr. Santos." *Id.* On the same day, May 11, 2018, Plaintiff filed another CDCR 602 Health Care Grievance, Tracking # RJD HC 18001741, seeking to be "re-evaluated because [his] Gabapentins [we]re not strong enough to control all nerve damage symptoms," and requesting "an additional pain killer to minimize acute pain," which he described "as high as 9[/]10" in his "neck, low back, mid back, migraine, [and] eyes." *See* ECF No. 75-4 at 27–28 & Ex. 5 at 72–74. In this grievance, Plaintiff refers both to his evaluation by Dr. Santos on May 7, 2018, as well as his long history of "issue[s] regarding pain," claims his "pain triggers seizures," and cites to his several lawsuits alleging inadequate medication management and incidents of "deliberate indifference" by a host of RJD medical care officials. *Id.* at 72–74.

Plaintiff filed three additional CDC 7362s on May 16, 2018, May 22, 2018, and May 26, 2018. *See* ECF No. 88 at 67–69. All three reported "severe" neuropathic pain, impaired vision, and troubled breathing. Within a day, Plaintiff was evaluated by three different triage RNs in response—on May 17, 2018, May 23, 2018, and again on May 27, 2018. *Id.*

On June 2, 2018, Plaintiff filed a fourth CDC 7362, again reporting nerve pain that "interferes with breathing" and "triggers seizures." *Id.* at 64. On June 4, 2018, Plaintiff was again evaluated by a RN who documented his "multiple complaints of neuropathy pain" so severe that he was unable to "pick up morning seizure meds." *Id.* at 65. The RN also noted, however, that Plaintiff stated he "able to pick up breakfast at 8:30" that day, and admitted he also "did not pick up his noon meds" because he "was in the library researching information on his 602s" and his "lawsuits regarding these same issues." *Id.* The RN "informed and reinformed about the importance of being compliant with medications at all pill times," referred Plaintiff to his PCP in 14 days to "discuss pain medications," but noted "no seizure activity," and that Plaintiff presented as "ambulatory with steady gait." *Id.*

On June 13, 2018, Plaintiff was again evaluated by Dr. Santos. *See* ECF No. 8-1 at 2 ¶ 4; ECF No. 75-4 at 28–29. Because he continued to report neuropathic pain at night, Santos increased Plaintiff's dose of Salsalate to 1000 mg three times per day, and "spread out the dose of Gabapentin to 600 mg four times a day to provide Gabapentin coverage at night." ECF No. 8-1 at 2 ¶ 4; ECF No. 75-4 at 29. Santos attests that Plaintiff was informed that while the total amount of Gabapentin had decreased from 2700 mg to 2400 mg daily, both the Salsalate dosage and the frequency of his Gabapentin doses had been increased to address his complaints of pain at night and he "agreed with this plan." ECF No. 8-1 at 2 ¶ 4. Plaintiff, however, swears both that he "was not sure" and could not "recall exactly why" Santos altered his Gabapentin dosage or frequency, and that Santos "never told [him]" that "he wanted to try the 600 mg four times a day because he thought it might provide more nighttime pain coverage." ECF No. 75-4 at 30, 32, 53–54.[6]

Santos also reviewed Plaintiff's Medication Administration Record ("MAR") and noted that he "never took the Salsalate" previously prescribed for his neuropathic pain, that he "had missed several doses of Gabapentin" during the two weeks prior, and "reminded [him] to be compliant with these medications." ECF No. 8-1 at 2 ¶ 4. Plaintiff admits that while he "miss[ed] a lot of [his] morning meds," and estimated that he failed to pick up them up as frequently as "at least once a week," he asserts this was because his pain was "basically out of control by the morning." ECF No. 75-4 at 30–31; ECF No. 88 at 3.

On June 20, 2018, Plaintiff's CDCR 602 Health Care Grievance, Tracking # RJD HC 1800120, first filed on January 31, 2018, and requesting "stronger pain medication" for his peripheral neuropathy, was denied at the Headquarters Level of Review. *See* ECF

---

[6] Plaintiff does not "believe it was better" for Santos to "split" his 2400 mg daily Gabapentin prescription into 4 doses, or to prescribe "an alternate medication" in order to address his complaints of overnight pain, and posits instead that "[i]t would be more reasonable to leave it at 2700 milligrams and increase the night [dose] with another 300 [mg]." ECF No. 75-4 at 54–55.

No. 75-4, Ex. 2 at 65–66. On June 26, 2018, Plaintiff filed another CDC 7362 reporting that he had "stop[ped] complying" with his Salsalate prescription because it was "ineffective [for his] nerve damage pain," and caused a "loss of appetite, loss of concentration, fatigue, heartburn, dizziness, nausea, and vomiting." ECF No. 88 at 63. Plaintiff again requested T3 "together with Gabapentin." *Id.*

July 11, 2018, Plaintiff again met with Santos who then discontinued the Salsalate due to Plaintiff's reports of dizziness. ECF No. 8-1 at 2–3 ¶ 4; ECF 75-4 at 34. Plaintiff was still prescribed a course of 600 mg Gabapentin 4 times a day but reported he "still ha[d] 9/10 pain in legs bilat at night when cold." *See* ECF No. 8-1 at 3 ¶ 4; ECF No. 88 at 80. Santos' Progress Notes also indicate Plaintiff appeared "asymptomatic," walked with a "normal, steady gait," was "awake, alert, oriented, and not in acute distress" at the time of the encounter. *See* ECF No. 88 at 80. Nevertheless, "to help control his pain," Santos added 500 mg of Naproxyn twice daily. *See* ECF No. 8-1 at 3 ¶ 4; ECF No. 75-4 at 34; ECF No. 88 at 56, 80-81. While Plaintiff attests he told Santos Naproxyn "kind of gave [him] stomach pain," Santos's notes indicate Plaintiff had previously been given 220 mg of Naproxen by the nurse, reported it "gave him relief," "agreed," and was "advised to report any side effects." ECF No. 88 at 81; ECF No. 75-4 at 34.

On September 13, 2018, Plaintiff submitted another CDC 7362 asking to see the doctor about neuropathic pain which he described as "severe" and at a "level 10." ECF No. 8-1 at 3 ¶ 5 & Ex. B at 9; ECF No. 3 at 3. Plaintiff did not report any stomach pain due to the Naproxyn, but did claim to have "fallen with injur[ies]" due to lightheadedness, to have "missed a lot of breakfasts[,] lunch[es] [,] dinner[s] … [and] medications," and requested that he be "medically unassigned."[7] ECF No. 8-1 at 3 ¶ 5 &

---

[7] "[W]hen a disabled inmate is unable to participate in any work, academic, Career Technical Education program or other program, even with reasonable accommodation, because of a medically determinable physical or mental impairment that is expected to last for less than six months, the classification committee shall place the inmate on temporary medical or psychiatric unassignment." *See* Cal. Code Regs., tit. 15 § 3044.1(d)(A).

Ex. B at 9; *see also* ECF No. 75-4 at 36. On the same day, Plaintiff filed CDCR 602 Health Care Grievance, Tracking # RJD HC 18002529, repeating the same claims, seeking "emergency" intervention to minimize his "severe neuropathic" "level 10" pain, and specifically asking that his 2400 mg per day Gabapentin dosage be "increased," and that he be labeled "unassigned due to medical, so "i[t] won't be mandatory to work in [the] kitchen." ECF No. 75-4 at 37–38 & Ex. 7 at 79–81.

On September 25, 2018, Santos examined Plaintiff and discussed the neuropathic pain complaints reported in his September 13, 2018 CDC 7362. *See* ECF No. 8-1 at 3 ¶ 6; ECF No. 1 at 4; ECF No. 3 at 3. Santos's Outpatient Progress Notes further document Plaintiff's history of "suicidal ideation, HTN, type 2 DM, and seizure," his request to be medically unassigned, his reports of "intermittent vision loss after throwing himself from the top bunk … five months ago," two subsequent eye exams, a recommendation for evaluation by a neuro-ophthalmologist at UCSD, and a scheduled brain MRI, which Plaintiff refused, citing claustrophobia. *See* ECF No. 8-1, Ex. C at 11.[8] Santos also noted Plaintiff's complaints of "needles poking, numbness, and burning sensation on the hands and feet," and "neuropathic pain" reported as "10/10" and "not controlled" by his then-current prescriptions of both 500 mg of Naproxyn twice daily and 600 mg Gabapentin four times per day. *Id.* at 11–12.

During this evaluation, Plaintiff claims to have told Santos he was worried his pain would "trigger seizures." ECF No. 3 at 3.[9] Santos "advised [Plaintiff] to try Lyrica," an FDA approved medication for neuropathic pain, but he refused citing previous negative

---

[8] Santos also notes that "CCHCS instructs physicians to use caution when prescribing Gabapentin to patients with suicidal behavior or ideation." *See* ECF No. 75 at 13 (citing ECF No. 75-4, Ex. 2 at 112).

[9] Santos's Outpatient Progress Notes dated September 25, 2018 indicate Plaintiff was also prescribed "DIVALPROEX SOD ER 500 MG, BID AM+PM" (Depakote®) for treatment of his reported seizures at the time. *See* ECF No. 8-1 at 4 ¶ 9 & Ex. C. at 11. Plaintiff admits Santos "left the [Depakote] the same way." *See* ECF No. 75-4 at 48–49.

side-effects. ECF No. 8-1 at 4 ¶ 8 & Ex. C a t 12; *see also* ECF No. 75-4 at 39–41. Plaintiff also "told [Santos] that at times he miss[ed] [his] morning dosage[s]" because he "c[ould not] get up because of the pain." ECF No. 3 at 3; ECF No. 75-4 at 32. In fact, Santos attests that "a review of [Plaintiff's] MAR showed he failed to take his prescribed Gabapentin dose on September 4, 8, 9, 12, 13, 14, 15, 16, 18, 19, 20, and 22," and that a further review of his medication record showed he "had been missing multiple doses every month," and was "non-compliant since March 2018." ECF No. 8-1 at 3 ¶ 6.

Santos also reported that on September 25, 2018, and "despite [Plaintiff's] complaint[s]," he was "ambulatory," required "no assistive device," walked with a "normal, steady gait," had no "leg limp," demonstrated "good posture," and did not "show any signs of painful distress such as grimacing." ECF No. 8-1, Ex. C at 12. Based on these observations and given Plaintiff's medical history, Santos added a prescription for Capsaicin, a topical cream for treatment of neurological pain, continued his prescription for Naproxyn, a non-steroidal anti-inflammatory, and referred him to a "Mental Health Pain Management Group for Cognitive Behavioral Therapy," and to a neurologist "for further evaluation of neuropathic pain not managed by Gabapentin or Lyrica." *Id.* at 4 ¶ 8; *see also* ECF No. 75-4 at 41.[10]

However, because Plaintiff's neurologist Dr. Malhotra reported "no indication for Neurontin (Gabapentin)" in 2016, *see* ECF No. 8-1 at 2 ¶ 3 & Ex. A at 7, and Santos's review of Plaintiff's subsequent MAR "show[ed] he [was] noncompliant with Gabapentin," had "missed numerous doses during the [previous] 3 months," and continually reported increased neuropathic pain "uncontrolled" by 2400 daily mgs of Gabapentin, Santos "determined that the risks of increasing [Plaintiff's] Gabapentin dosage, or even continuing with th[at] medication outweighed the benefits." ECF No. 8-1 at 3 ¶ 6; *see also* Ex. C at 13 (noting that "Gabapentin will be tapered off."). Santos

---

[10] In his Deposition testimony, Plaintiff admits "after September 2018," he continued to be treated by a neurologist, Dr. Malhotra. *See* ECF No. 75-4 at 41–42.

further attests that Gabapentin in higher doses can cause dizziness, and notes that Plaintiff reported vision loss, and to have "fallen several times" while prescribed Gabapentin. *See* ECF No. 8-1 at 3 ¶¶ 6, 7 ("The side effects of Gabapentin include dizziness, ataxia, nystagmus, somnolence, and amnesia, the risk of which increases along with the dosage."); *id.* ¶ 7 (noting Plaintiff's "ongoing complaints of vision loss, for which no medical cause ha[d] been found, … could potentially be complicated by Gabapentin.").

Finally, Santos attests Gabapentin "ha[s] the potential to be a habit-forming addictive medication … at higher doses," and "in several studies … has been a drug of abuse." ECF No. 8-1 at 3 ¶ 7; ECF No. 75-4, Ex. 3 at 130 (CCHCS Feb. 18, 2019 Memorandum urging limitations on Gabapentin due to its "propensity for abuse."). Santos further points to Plaintiff's medical records, which "show he has a history of amphetamine, cocaine, methamphetamine, and marijuana abuse." ECF No. 8-1 at 3 ¶ 7; *see also* Ex. C at 12; ECF No. 12 at 55. And while Plaintiff denies ever "using drugs in prison," *see* ECF No. 88 at 5, he admits "other prisoners" sometimes hoard or sell their narcotic medications, and that Gabapentin, while not a narcotic, "does give you a mood change," and "kind of get[s] you high." *See* ECF No. 75-4 at 50.

In the Declaration he filed in support of his first Motion for TRO, Plaintiff swears Santos "didn't care what [he] was going thr[ough]," and "didn't give [him] a justifiable reason" to "take [him] off the Gabas." *See* ECF No. 3 at 3. When he was  deposed however, Plaintiff admits he could not "recall the specifics," explain "more about what was his [Santos's] justification," or cite "exactly why" Santos decided to taper or terminate his Gabapentin. *See* ECF No. 75-4 at 30, 54, 56. Plaintiff further admits he does not remember if Dr. Santos "actually told [him] [he was] going to take [him] off Gabapentin," *see* ECF No. 75-4 at 45, but he surmises the "reason was because I was a convict and [] can't be trusted." ECF No. 3 at 3. Plaintiff acknowledges that "if I keep complaining about the pain … I'm also complaining that medication is not as effective." *See* ECF No. 75-4 at 56.

Between September 25, 2018 and October 8, 2018, Plaintiff alleges to have suffered "approximately three seizures," which he claims were "obvious[ly] due to his being "taken off of Gabapentin." ECF No. 3 at 4; ECF No. 75-4 at 52. On September 27, 2018, and again on October 1, 2018, Plaintiff filed two additional CDCR 602 Health Care Grievances, Tracking # RJD HC 18002642 & # RJD HC 18002641, both requesting "to be put on … 2400 mg Gabapentin + something else," and reporting to have suffered a seizure "last night" (September 30, 2018).[11] *See* ECF No. 75-4 at 46–47 & Ex. 9 & 10 at 86–95.[12]

---

[11] In both these grievances, Plaintiff complains of continued neuropathic pain at a level 10, and attributes the pain to Dr. Santos's reduction of his 2400 mg Gabapentin, which "was effective for [his] seizures." *See* ECF No. 75-4, Ex. 10 at 90–92; Ex. 9 at 86. CDCR 602 Tracking # RJD HC 18002642 does allege Santos had committed an "Eighth Amendment violation" because he "didn't care" if Plaintiff's "life [was] at risk with uncontrolled seizures," *see* ECF No. 75-4 Ex. 9 at 88, but neither of these grievances contain any allegation that Santos either reduced or discontinued Plaintiff's Gabapentin on September 28, 2018 because he "complain[ed] again" and/or continued to file medical grievances. *Cf.* ECF No. 3 at 3.

[12] Dr. Santos describes Plaintiff's claims of having suffered "three seizures and increased pain between September 25, 2018 and October 8, 2018, due to his levels of Gabapentin [as] not supported by his medical records." ECF No. 8-1 at 4 ¶ 9. Santos attests that Plaintiff was prescribed Depakote at the time, "the seizures were never witnessed by medical staff," and that prior EEGs, and an October 5, 2019 CT scan of Plaintiff's brain were all "normal." *See* ECF No. 36-2 at 3 ¶ 10. Santos further contends that even "if Plaintiff did have the alleged seizures, it was because he was non-compliant with his Depakote, and not because of [his] Gabapentin dosage." ECF No. 8-1 at 4 ¶ 9. Specifically, Santos attests Plaintiff's medication records for the month of September 2018 show "he took the full prescribed dose" of 500 mg of Depakote twice a day only on five days—September 1, 6, 7, 13, and 21. *Id.* Plaintiff's records further show he took only "half the dose on [September] 2, 3, 9, 14, 20, 23, 28, 29, and 30," and "did not take any Depakote for the remaining 16 days." *Id.* Plaintiff acknowledges that Depakote is prescribed "for seizures," and that he "do[esn't] know if Depakote was the one doing the trick or was it Gabapentin by itself," because "Gabapentin was also being addressed as part of the seizure medication." ECF No. 75-4 at 52. When asked during his deposition if "any doctors diagnosed [him] with partial

Both these grievances appear to have been rejected at the Institutional Level of Review on October 10, 2018, *see* ECF No. 75-4, Exs. 9 & 10 at 86, 90, but Plaintiff was nevertheless interviewed by R. Zhang, MD, on October 10, 2018, who "provided a secondary review of his medical records, along with an in person exam." ECF No. 8-1 at 4 ¶ 10; ECF No. 36-2 at 2 ¶ 3. Dr. Santos describes this as "standard procedure," but Plaintiff's exhibits suggest Dr. Zhang interviewed him on October 10, 2018 for purposes of conducting the Institutional Level Review of CDCR 602 Tracking # RJD HC 18001741, which Plaintiff originally submitted on May 11, 2018.[13] *See* ECF No. 88, Ex. O at 152–155. Zhang "completed [an] assessment, evaluated [Plaintiff] for nerve pain, noted review of [his] history, current symptoms, and laboratory/imaging results, and developed a plan of care, including active medication orders for the medications Gabapentin, Capaiscin cream, and Naproxen for pain management." *Id.* at 155. According to Dr. Santos, Dr. Zhang "prescribed a 900 mg daily dose of Gabapentin" for Plaintiff's neuropathy on October 9, 2018, and "incrementally increased it to 1800 mg" where it remained until December 12, 2018, "under the supervision of the new C Yard physician[,] Dr. Guldseth." *See* ECF No. 8-1 at 4–5, ¶ 10; *see also* ECF No. 75-4 at 49; ECF No. 3 at 4.[14]

---

seizures," Plaintiff acknowledges an "MRI, CAT scan, [and] EEG [all] c[a]me up negative." ECF No. 75-4 at 52–53.

[13] "Health care staff who participated in the event or decision being grieved may not interview the grievant." Cal. Code Regs. tit. 15, § 3999.228(h) (2019).

[14] In the interim, on October 31, 2018, Plaintiff filed another CDCR Health Care Grievance, Tracking No. RJD HC 18002825, again complaining of Santos's September 25, 2018 decision to taper his Gabapentin. *See* ECF No. 75-4, Ex. 11 at 94–96. In it, Plaintiff admits his Gabapentin dosage had been restored to 1800 mg, but reported it did "not help at all [his] pain." *Id.* at 96. Plaintiff again claimed Dr. Santos "d[idn't] care if [his] Gabas control [his] seizures," requested 2700 mg of Gabapentin "or [to] add methadone," and requested that his "Depakote … be reduced by ½." *Id.* This grievance was rejected at the Institutional Level of Review on November 13, 2018. *Id.* at 94. However, Plaintiff was "seen by the

Dr. Santos attests that after he was transferred to E-Yard on October 25, 2018, *see* ECF No. 8-1 at 2 ¶ 2, Plaintiff "continued to request increased doses of Gabapentin for unwitnessed seizures and nerve pain" from Dr. Guldseth, who ultimately diagnosed him with "drug seeking behavior for Gabapentin." ECF No. 36-2 at 2 ¶ 3.[15] Specifically, Plaintiff was "noted to have inconsistent exams" and made "questionable complaints of nerve pain/neuropathic pain on [his] right wrist." *Id.* ¶ 4. Therefore, Dr. Guldseth ordered a nerve conduction study of his upper right extremity to verify a diagnosis of neuropathy. *Id.* The neurologist, Dr. Malhotra, conducted the study on April 23, 2019, but "the results were normal." *Id.* When additional nerve conduction studies were ordered to evaluate Plaintiff's lower extremities, Plaintiff refused. *Id.*

On June 3, 2019, Guldseth "noted that [Plaintiff] had been refusing" to submit to required blood draws. *Id.* ¶ 5. Plaintiff attests that at this point "every time [he] ask[ed] for Gabapentin, they thought [he] was misusing it." ECF No. 75-4 at 50. According to Dr. Guldseth, "drug testing is important in prison to ensure inmate compliance to their medications." *See* ECF No. 36-2 at 2 ¶ 5. Plaintiff acknowledges that when prisoners are suspected of misusing, hoarding, or selling their medications, "they do blood draws," and that he did "not recall" missing the three blood draws noted in his medical records. ECF No. 75-4 at 50. Santos testifies that Dr. Guldseth's treatment notes indicate that "he began tapering [Plaintiff] from Gabapentin" as of June 3, 2019, "because of [his] drug

---

primary care provider" on November 8, 2018, "where it was documented [he] would remain on the current dosage of Gabapentin as it had recently been increased; methadone was not indicated." *See* ECF No. 88, Ex. O at 145–146 (Headquarters' Level Response, RJD HC 18001741, dated Jan. 16, 2019).

[15] Plaintiff has since filed a new § 1983 action alleging Eighth Amendment violations against Dr. Guldseth with respect to his Gabapentin prescription during December 2018 through December 2019. *See Arellano v. Guldseth, et al.*, S.D. Cal. Civil Case No. 3:20-cv-01633-TWR-RBM, Compl, ECF No. 1 at 1–7.

abuse history," and his "failure to take required drug tests," which made the "risks of continuing to prescribe Gabapentin outweigh the benefits." ECF No. 36-2 at 2–3 ¶ 5.

On June 4, 2019, and again on June 5, 2019, Santos testifies Plaintiff's medical records show he went "man down" and was taken to the Triage and Treatment Area ("TTA") based on his complaints of head and chest pain. *See* ECF No. 36-2 at 3 ¶¶ 6–7. Once in TTA, however, Plaintiff "requested an increase[d] dose of Gabapentin, which was being tapered." *Id.* ¶ 6. The TTA physician, Dr. Martin, "explained that Gabapentin is not a good agent for neuropathic pain nor for seizures," and prescribed Cymbalta instead.[16] *Id.* When Plaintiff repeated his complaints and requested more Gabapentin the next day, Dr. Martin "described [Plaintiff's] behavior as 'manipulative' to acquire more Gabapentin." *Id.* ¶ 7.[17]

After he was "fully tapered from the Gabapentin," Plaintiff was again evaluated by the neurologist, Dr. Malhotra, on June 24, 2019, "for his pain complaints." *Id.* ¶ 8. When he "again request[ed] high doses of Gabapentin," Malhotra instead recommended increased doses of Cymbalta. *Id.* Plaintiff continued on Cymbalta until August 22, 2019, when Dr. Guldseth discontinued that prescription based on Plaintiff's complaints of stomach pain, occasional vomiting, and other GI symptoms. *Id.* ¶ 9.

On February 6, 2020, Plaintiff reported to his then-PCP, Dr. Luu, that his Depakote was causing suicidal thoughts. *Id.* at 4 ¶ 11. Dr. Luu changed his seizure medication to Dilantin. *Id.* On April 27, 2020, Plaintiff reported "lightheadedness and a loss of consciousness," again requested Gabapentin, and was re-evaluated by Dr. Malhotra

---

[16] Cymbalta® is the brand name for Duloxetine, and included in the CCHCS's non-opioid pain management therapy guidelines as an adjuvant formula medication for chronic pain. *See* ECF No. 75-4 at 111.

[17] Plaintiff has also filed a subsequent § 1983 complaint alleging deliberate indifference on the part of Dr. Martin and other medical officials arising in June through August 2019. *See Arellano v. Jones, et al.*, S.D. Cal. Civil Case No 3:20-cv-00228-TWR-RBM, "Amend. Compl.," ECF No. 6 at 4–5.

regarding his "alleged" and "unwitnessed" seizures. *Id.* ¶ 12. Malhotra noted Plaintiff's prior EEGs were normal, his prior record of substance abuse, and "the fact that most anti-seizure medications" did not control his reported seizures. *Id.* Malhotra "decided to keep [Plaintiff's] medication the same until a 1-hour EEG was performed." *Id.*

On May 14, 2020, Plaintiff again reported to the TTA, and this time claimed the Dilantin previously prescribed by Dr. Luu was causing suicidal thoughts. *Id.* ¶ 13. Dr. Santos was on duty, examined him, and "asked [Plaintiff] which medication he felt worked best." *Id.* Santos claims Plaintiff reported Depakote "worked well and did not make him suicidal," which was "contrary" to what he told Dr. Luu on February 6, 2020. *Id.* Santos re-prescribed 1000 mg of Depakote, which, in conjunction with Tylenol and Capsaicin cream for pain, is where Plaintiff's anti-seizure and pain medication remained as of June 8, 2020. *Id.* ¶¶ 9, 13. At the time he was deposed on January 22, 2021, Plaintiff testifies he had not been prescribed Gabapentin since June 2019. *See* ECF No. 75-4 at 51.

C. <u>Arguments</u>

Dr. Santos first seeks summary judgment with respect to Plaintiff's Eighth Amendment inadequate medical care claims because evidence in the record demonstrates his decisions with respect to Plaintiff's Gabapentin prescription during the months of June through September 2018 were medically appropriate under the circumstances. *See* Def.'s Mem. of P&A's in Supp. of Mot. for Summ. J., ECF No. 75 at 17–18. Specifically, Santos argues there is no genuine dispute with respect to any deliberate indifference on his part because the risks of continuing or increasing Plaintiff's Gabapentin prescription outweighed the benefits, the decision to taper and then discontinue Plaintiff's Gabapentin prescription complied with California Correctional Health Care Services ("CCHCS") policy, and he offered Plaintiff reasonable alternatives. *Id.* at 13–14.

Defendant Santos also seeks summary judgment with respect to Plaintiff's First Amendment retaliation claims on grounds that he failed to exhaust available administrative remedies before filing suit, *id.* at 20–22, and because the evidence in the record is insufficient to show his treatment decisions were adverse to Plaintiff's health,

motivated by his protected conduct, or did not reasonably advance a legitimate correctional goal. *Id.* at 22–26.

Finally, Santos claims that because Plaintiff does not have a clearly established right to dictate any specific course of treatment, he is entitled to qualified immunity with respect to Plaintiff's Eighth Amendment claims for damages. *Id.* at 27–28.

Plaintiff opposes on all grounds—arguing primarily that while he "might not have a right to preferred treatment," Gabapentin was "effective and adequate" to treat both his nerve damage pain and seizures. *See* ECF No. 88 at 26. Plaintiff claims his medical records show "Gabapentin is the only medication that works," and therefore, Santos's decision to taper and then "take[] [it] away … without substituting it with anything, while knowing [he would] be having seizures" because he complained about his dosage and/or his continued pain demonstrates both Santos's deliberate indifference and his retaliatory intent. *Id.* at 26–27.

D.   <u>Discussion</u>

1.   ***Eighth Amendment Inadequate Medical Care Claims***

a.   *Standard of Review*

The government has an "obligation to provide medical care for those whom it is punishing by incarceration," and a failure to meet that obligation can violate the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). In order to prevail on an Eighth Amendment claim for inadequate medical care, however, a prisoner must show "deliberate indifference" to his "serious medical needs." *Id.* at 104. This includes "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

To meet the Eighth Amendment's objective requirements, the prisoner must demonstrate the existence of a serious medical need. *Estelle*, 429 U.S. at 104. A sufficiently serious need exists if failure to treat his injury or condition "could result in

further significant injury" or cause "the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotation marks omitted) (citing *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)).

To meet the Eighth Amendment's subjective requirement of deliberate indifference, a "high legal standard," a prisoner must demonstrate the defendant "kn[e]w[] of and disregard[ed] an excessive risk to [his] health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057, 1060 (9th Cir. 2004) (internal quotation marks and citation omitted). This "requires more than ordinary lack of due care." *Farmer v. Brennan*, 511 U.S. 825, 835, (1994) (internal quotation marks omitted) (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

"In deciding whether there has been deliberate indifference to a prisoner's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989). However, "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). Rather, "to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi*, 391 F.3d at 1058 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996), *overruled in part on other*

*grounds by Peralta*, 744 F.3d at 1076)); *accord Gordon v. Cty. of Orange*, 6 F.4th 961, 970 (9th Cir. 2021).

> b.    *Analysis*

No party disputes Plaintiff's medical needs are objectively serious. *See Estelle,* 429 U.S. at 104; *Jett,* 439 F.3d at 1096; *McGuckin,* 974 F.2d at 1059. Nevertheless, based on the record before it, this Court finds no jury could reasonably conclude that Dr. Santos acted with deliberate indifference to Plaintiff's pain or his reported seizures.

Plaintiff claims his medical records show "Gabapentin is the only medication that works," and that Dr. Santos decided to taper and then "take[] [it] away … without substituting it with anything." *See* ECF No. 88 at 26–27. However, the undisputed evidence in the record instead shows Plaintiff:  (1) had a medical history dating back to 2011 of chronic neuropathic pain for which he was continually treated by prison doctors, nurses, psychologists, and a neurologist before Santos was assigned as his PCP from March 22, 2018 through October 25, 2018; (2) was prescribed a series of analgesics including NSAIDS (Tylenol, Ibuprofen, Naproxyn, Salsalate, Sulindac), tricyclic antidepressants (Amitriptyline, Nortriptyline), SNRIs (Cymbalta), anti-epileptics (Keppra, Dilantin, Depakote, Gabapentin, Lyrica, Tegretol), and a topical local anesthetic (Capsaicin); (3) underwent various diagnostic tests such as X-rays, EEGs, MRIs, a CT scan, and a nerve conduction study; (4) was enrolled in the Mental Health Services Delivery System at the CCCMS level of care;  and (5) was referred to a neurologist, a neuro-opthalmologist, recommended for cognitive behavioral therapy, and offered other non-pharmacological, and non-opioid chronic pain management therapies.

Indeed, Plaintiff's own testimony and exhibits also reveal that from January 31, 2018—two months before Dr. Santos was assigned as his PCP—until October 25, 2018—the time Dr. Santos was transferred to E-Yard, he submitted at least seven separate HC 7362 Health Care Services Request Forms, and seven CDCR 602 HC Health Care Grievances. In response to each HC 7362, Plaintiff was evaluated by nurses within 24 to 48 hours. He was also personally examined by Dr. Santos on five occasions, either

as follow-up to his HC 7362s or in response to his CDCR 602 Health Care Grievances, on May 7, 2018, June 13, 2018, July 11, 2018, September 13, 2018, and again on September 25, 2018. Each time, Plaintiff complained of neuropathic pain, and each time Dr. Santos prescribed, re-prescribed, tapered, or adjusted his medication and dosages, and suggested alternative pain medications he determined were indicated based on Plaintiff's physical comorbidities, medical care record, mental health, and documented history of noncompliance with both his Gabapentin and Depakote prescriptions.

And while the record also shows Plaintiff's repeatedly insisted that only increased levels of Gabapentin were appropriate to treat both his pain and his seizures, Plaintiff is not a medical expert, and his unsupported lay opinion as to the efficacy or superiority of Gabapentin over any alternate medication is insufficient as a matter of law to establish a genuine factual dispute. *See Estelle*, 429 U.S. at 93 (stating that the question whether "additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment"); *Toguchi*, 391 F.3d at 1058 (finding arguments that "Seroquel is superior to Triafon and therefore should not have been discontinued" insufficient to establish deliberate indifference); *see also Randall v. Wyrick*, 642 F.2d 304, 308 & n. 9 (8th Cir. 1981) (holding that the prisoner's "difference of medical opinion over matters of expert medical judgment or a prescribed course of treatment fails to state a federal constitutional question," and noting that while a prisoner's "subjective response to a course of treatment" is not "unimportant," that "subjective response does not furnish a sufficient factual basis" for questioning a "medical decision which is otherwise supported by substantial evidence") (cited with approval in *Sanchez*, 891 F.2d at 242); *O'Brien v. Saha*, No. 19-CV-1957-JLS (JLB), 2021 WL 960693, at *6 (S.D. Cal. Mar. 15, 2021) (concluding that "no reasonable juror could find that Defendants were deliberately indifferent to Plaintiff's pain in tapering him off morphine and gabapentin and pursuing a variety of other pain treatment options over a period of many months."); *DeGeorge v. Mindoro*, 2019 WL 2123590, at *7 (N.D. Cal. May 15, 2019) ("Because Defendants attempted to treat Plaintiff's pain, they cannot be said to have been

'indifferent' to it," much less deliberately so, and "[a]lthough plaintiff disagreed with the doctors' treatment decisions, merely disagreeing does not show a triable issue in support of plaintiff's claim."); *Parlin v. Sodhi*, 2012 WL 5411710 at *5 (C.D. Cal. Aug. 8, 2012) ("At its core, Plaintiff's claim is that he did not receive the type of treatment and pain medication that he wanted when he wanted it. His preference for stronger medication— Vicodin, Tramadol, etc.—represents precisely the type of difference in medical opinion between a lay prisoner and medical personnel that is insufficient to establish a constitutional violation.").

In sum, the medical records before the Court, offered both by Dr. Santos in support and by Plaintiff in opposition, establish that the medications and overall course of treatment Dr. Santos provided to Plaintiff from March 2018 through October 2018 was medically appropriate under the circumstances. *See Toguchi*, 391 F.3d at 1058; *Jackson*, 90 F.3d at 332. Plaintiff obviously disagrees, but his lay opinion alone, unsupported by any "particular parts of materials in the record, including depositions, documents, … affidavits or declarations, stipulations, … admissions, interrogatory answers," or other admissible evidence which corroborates his conclusion or reasonably tends to show Dr. Santos chose any particular course of treatment with conscious disregard of his needs, is insufficient to establish a genuine dispute. Fed. R. Civ. P. 56(c)(1)(A); *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot defeat summary judgment.");  *Schultz v. Leighton*, 325 F. Supp. 3d 1069, 1077–78 (N.D. Cal. 2017) (finding prisoner failed to "show any unmet medical need, much less deliberate indifference" and granting summary judgment where prisoner's "claim of a need for morphine, or any treatment other than the treatment he received, [wa]s based entirely on self-diagnosis and [without] medical support.").

For these reasons, the Court holds that Dr. Santos is entitled to summary judgment with respect to Plaintiff's Eighth Amendment inadequate medical care claims.

3:18-cv-02391-BTM-WVG

### 2.    *First Amendment Retaliation Claims*

Defendant Santos next seeks summary judgment with respect to Plaintiff's claims that he reduced and then discontinued his Gabapentin prescription in retaliation for his having "submitt[ed] more medical forms" and "complaint[s] about [his] inadequate medical treatment." *See* ECF No. 1 at 4; ECF No. 3 at 3; ECF No. 75 at 20–26.

### a.    *Exhaustion*

First, Santos contends "it is undisputed that Plaintiff failed to exhaust a grievance alleging retaliation against [him]." *See* ECF No. 75 at 21–22. In support, Santos proffers the Declaration of E. Frijas, RJD's Appeals Coordinator, whose Office "receives all inmate grievances (also known as appeals of CDCR Form 602s) submitted by inmates at the institutional level (i.e. first and second levels of review)," including *"staff complaints made against medical staff.*" ECF No. 75-5 at 1–2, ¶¶ 1, 3 (emphasis added). Frijas attests that he performed a "search of the Inmate Appeals Office records for any staff complaints filed by Plaintiff … against Dr. Santos," and "none were located." *Id.* ¶ 1.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 ..., or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Pre-suit exhaustion of available remedies is mandatory. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

Failure to exhaust is "an affirmative defense the defendant must plead and prove." *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007). On summary judgment, it is Defendant Santos's burden "to prove that there was an available administrative remedy, and that [Plaintiff] did not exhaust that available remedy." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc) (citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n.5 (9th Cir. 1996)). The burden of production then shifts to Plaintiff "to come forward with evidence" showing either that he did properly exhaust his claims before filing suit, or that "there is something in his particular case that made the existing and generally available

26

remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. To avoid summary judgment, Plaintiff must "provide evidentiary support to rebut defendant[']s[] [evidence] that he [did] not exhaust[]" his claim. *Marella*, 568 F.3d at 1028; *see also Draper v. Rosario*, 836 F.3d 1072, 1079 (9th Cir. 2016) (noting that once the burden shifts to him on summary judgment, a prisoner must "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." (citing *Albino*, 747 F.3d at 1172).

In 2018, the California Department of Corrections and Rehabilitation ("CDCR") provided inmates with the following administrative remedies, also referred to as the administrative grievance process.[18] The CDCR provided its inmates the right to appeal administratively "any policy, decision, action, condition or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety or welfare." Cal. Code Regs., tit. 15 § 3084.1(a) (2019). "Grievance issues are separated into two categories:  custody issues and healthcare issues." *Calderon v. Koenig*, No. 19-CV-07949-HSG, 2021 WL 3675210, at *2 (N.D. Cal. Aug. 19, 2021).

To grieve a custody issue, a prisoner submitted a CDCR Form 602 which described the specific issue being grieved and the relief requested. *See* Cal. Code Regs., tit. 15 § 3084.2(a) (2019). The prisoner was required to state all facts known and available to him regarding the issue being grieved at the time of submission; and list all

---

[18]   The Court notes that the CDCR's administrative grievance procedures underwent a substantial restructuring in 2020. "On March 25, 2020, and effective June 1, 2020, California Code of Regulations, Title 15, sections 3084 through 3084.9 were repealed and replaced with renumbered and amended provisions at sections 3480 through 3487." *Calderon v. Koenig*, No. 19-CV-07949-HSG, 2021 WL 3675210, at *1 (N.D. Cal. Aug. 19, 2021). However, because Plaintiff's claims arose in 2018, the citations in this order refer to the California regulations in place in 2018, and not to the administrative grievance regulations currently in effect.

staff members involved and describe their involvement in the issue. *See* Cal. Code Regs., tit. 15 § 3084.2(a)(1), (4) (2019). To exhaust available administrative remedies for custody grievances, a prisoner was required to proceed through three levels of review: (1) a first formal level filed with one of the institution's appeal coordinators; (2) a second formal level filed with the institution head or designee; and (3) a third formal level filed with the CDCR director or designee. *See* Cal. Code Regs., tit. 15 § 3084.7 (2019). Pursuing a custody grievance through the third and final level was deemed sufficient to satisfy the exhaustion requirement set forth in 42 U.S.C. § 1997e(a). *See* Cal. Code Regs., tit. 15 § 3084.1(b) (2019); *Calderon*, 2021 WL 3675210, at *2.

To grieve a healthcare issue, a prisoner is required to submit a CDCR Form 602 HC which "explain[s] the decision, action, condition, omission, policy, or regulation that ha[s] had a material adverse effect upon [his] health and welfare for which [he] seek[s] administrative remedy." Cal. Code Regs., tit. 15 §§ 3999.226, 3999.277(a) (2019). The prisoner is required to "document clearly and coherently all information known and available to him … regarding the issue," and identify the staff member involved. *See* Cal. Code Regs., tit. 15 § 3999.226(g) (2019). Healthcare grievances are subject to two levels of review: an institutional level of review and a headquarters level of review. *See* Cal. Code Regs., tit. 15 § 3999.226(a)(1), (g) (2019). "Health care grievances are screened to identify whether they should be rejected and to ascertain whether they should be addressed as a health care staff complaint." *Madsen v. Toor*, 2021 WL 1839612, at *4 (E.D. Cal. May 7, 2021) (citing Cal. Code Regs., tit. 15 §§ 39999.228, 3999.231(b)), *report and recommendation adopted*, 2021 WL 2212247 (E.D. Cal. June 1, 2021). Rejection or withdrawal of a healthcare grievance does not exhaust administrative remedies. *See* Cal. Code Regs., tit. 15 § 3999.226(g). Instead, a headquarters' level review is required. *See* Cal. Code Regs., tit. 15 §§ 3087.5(h), 3999.230 (2019); *Calderon*, 2021 WL 3675210, at *2.

Here, the Court finds the Declaration of E. Frijas, who attests that he performed a search of the Inmate Appeals Office records for any "*staff complaints made against*

*medical staff*" filed by Plaintiff involving Dr. Santos and that "none were located," is sufficient to prove that while there was an administrative remedy available to Plaintiff, he failed to properly exhaust that remedy with respect to his retaliation claims. *See Albino*, 747 F.3d at 1172; *see also* ECF No. 75-5 at 1–2 ¶¶ 1–3.

The burden on summary judgment thus shifts to Plaintiff to "come forward with evidence" which rebuts Frijas's testimony, and "puts material facts into dispute" with respect to the proper exhaustion of his retaliation claim. *See Albino*, 747 F.3d at 1172; *Draper*, 836 F.3d at 1079–80. Plaintiff does not directly address Frijas's Declaration, however, and does not point to any other evidence in the record to "identify any actions that prison staff took [to] impede[] his ability to exhaust … or otherwise explain why he failed to comply with the administrative process." *Draper*, 836 F.3d at 1080. Plaintiff attests only that he filed approximately 40 grievances between 2018 and the time of his deposition, admits he cannot remember precisely when or which of his grievances included his retaliation claims against Dr. Santos, and that he cannot recall whether any grievance that included his retaliation claims against Dr. Santos "got to the third level," or was "thwarted or prevented from being processed by any CDCR staff." *See* ECF No. 75-4 at 58–60.

Instead, in his Opposition, Plaintiff argues that two of his CDC 602 Health Care Grievances, specifically RJD HC 18001741 and RJD HC 18002825, "state the facts necessary to state a retaliation claim" against Dr. Santos and that they "should be sufficient" to satisfy 42 U.S.C. § 1997e(a)'s exhaustion requirement. *See* ECF No. 88 at 8 & Ex. O at 144–159; ECF No. 75-4, Ex. 11 at 94–97.

"[T]o properly exhaust administrative remedies prisoners 'must complete the administrative review process in accordance with the applicable procedural rules,' [ ] - rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88, 90 (2006)); *see also Marella*, 568 F.3d at 1027 ("The California prison system's requirements 'define the boundaries of proper exhaustion.'") (quoting *Jones*, 549 U.S. at 218).

As noted above, and even assuming a HC 602 Health Care Grievance was the appropriate procedural means by which to exhaust his medical retaliation claims against Dr. Santos, *see e.g.,* Cal. Code Regs. tit. 15, § 3999.226(a) ("The health care grievance process provides an administrative remedy to patients under health care's jurisdiction for review of complaints of applied health care policies, decisions, actions, conditions, or omissions that have a material adverse effect on their health or welfare."), California's regulations require that he "document clearly and coherently all information known and available to him … regarding the issue," and "include any involved staff member's last name, first initial, title or position, and the date(s) and description of their involvement." Cal. Code Regs. tit. 15, § 3999.227(g), (1) (2019).

The amount of detail in an administrative grievance necessary to properly exhaust a claim is determined by the prison's applicable grievance procedures. *Jones*, 549 U.S. at 218. But where the procedures "do not specify the requisite level of detail," *see Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009), or are "incomplete as to [its] factual specificity," the grievance will suffice if it "'alerts the prison to the nature of the wrong for which redress is sought.'" *Sapp v. Kimbrell,* 623 F.3d 813, 824 (9th Cir. 2010) (quoting *Griffin*, 557 F.3d at 1120). "The 'primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution.'" *Reyes v. Smith*, 810 F.3d 654, 659 (9th Cir. 2016) (quoting *Griffin*, 557 F.3d at 1120).

Both RJD HC 18001741, which Plaintiff submitted on May 11, 2018, four days after Plaintiff was first evaluated by Dr. Santos, and RJD HC 18002825, submitted on October 31, 2018, more than a month after Dr. Santos last evaluated him on September 25, 2018, identify Santos as Plaintiff's PCP. *See* ECF No. 88, Ex. O at 152–153; ECF No. 75-4, Ex. 11 at 96; Cal. Code Regs. tit. 15, § 3999.227(g), (1) (2019). But neither of these grievances contain any facts, allegations, detail, or "enough information" to "provide notice of the harm"-- specifically that Dr. Santos was not only denying Plaintiff adequate medical care with respect to his pain and seizure medications, but also that he

was doing so in retaliation for Plaintiff's repeated complaints. *See Griffin*, 557 F.3d at 1120-1121; *Sapp*, 623 F.3d at 824.

Specifically, in RJD HC 18001741, Plaintiff admits he "saw PCP Santos" on May 7, 2018 "regarding 3 issues (1) urine (2) vision impairment (3) pain." *See* ECF No. 88, Ex. O at 152, 153. Plaintiff then describes his "nerve damage," mentions two other civil rights cases he filed against Officer Hodge, Dr. Sedighi, and Nurses Melton and Pasha, specifies that "my issue here is regarding pain," requests that his grievance be classified as an "emergency or urgent 602," and asks that Santos "prescribe[] stronger pain meds," because his "Gabapentins are not strong enough to control all nerve damage symptoms." *Id.* at 153. However, nothing in the CDCR HC Form he completed on May 11, 2018, even when considered in the light most favorable to Plaintiff is sufficient to put RJD officials on notice of Dr. Santos's alleged retaliatory intent or action in response to Plaintiff's medical complaints. *See Wright v. Beck*, 981 F.3d 719, 726 (9th Cir. 2020).

Nor does RJD HC 18001741 provide "enough information … to allow prison officials to take appropriate responsive measures" in response to the nature of any problem other than the alleged inadequacy of his pain medication. *See Griffin*, 557 F.3d at 1121; *Sapp*, 623 F.3d at 824 (concluding that while prisoner's grievance was sufficient to exhaust his claim against a doctor alleged to have denied him needed medical treatment for an eye condition, it was insufficient to exhaust other claims involving access to his medical file or the improper screening of his grievances); *see also Shaw v. Thomas*, 2019 WL 162729 at *18–19 (N.D. Cal. Jan. 10, 2019) (granting summary judgment where record "[did] not show that there were any retaliation claims or allegations of retaliation" against a Physician's Assistant alleged to have discontinued a follow-up appointment in prisoner's health care appeal claiming inadequate medical care related to bone reconstruction surgery).[19]

---

[19] Defendant Santos claims RJD HC 18001741, "was rejected for being duplicative" and that he "did not dispute that rejection." *See* Def.'s P&As in Supp. of Mot. for Summ. J.,

In his Opposition, Plaintiff claims, and the Court agrees, that he included allegations that Santos "told [him] if [he] ke[pt] insisting[,] he w[ould] take 'm all off," in HC178001741. *See* ECF No. 88 at 21, 149. But even if this statement was sufficient to alert appeals officials that he was raising a retaliation claim against Dr. Santos separate and apart from his claims of medical indifference under *Griffin* and *Sapp*, it was not included in the original CDCR 602 HC grievance he submitted on May 11, 2018. *See* ECF No. 88 at 152–53. Instead, Plaintiff included this language for the first time on October 26, 2018, when he appealed the October 24, 2018 Institutional Level Response to the Headquarters' Level of Review. *See* ECF No. 88 at 145–47, 150, 154–55.

Title 15 of the California Code of Regulations provides that if an inmate is dissatisfied with the Institutional Level Health Care grievance disposition, he may appeal to the Headquarters' Level, but "[t]he grievant shall not include new issues that were not included in the original health care grievance." Cal Code Regs., tit. 15 § 3999.229(a)(3) (2019). Title 15 further provides that "[a]t its sole discretion, HCCAB[20] may address new issues not previously submitted or included in the original health care grievance[,]" but only a "headquarters' level disposition addressing new issues exhausts administrative remedies." Cal. Code Regs., tit. 15 § 3999.230(i), (j) (2019).

---

ECF No. 75 at 11 (citing ECF No. 75-4, Ex. 5 at 72–73). The Court finds, however, that while this grievance was initially rejected on May 30, 2018, Plaintiff *did* object, and in fact, ultimately RJD HC 18001741was accepted for review and considered at both the Institutional and Headquarters Levels of Review. *See* ECF No. 88 at 2 & Ex. O at 145–47, 154–55, 156–59.

[20] "The Health Care Correspondence and Appeals Branch ('HCCAB') is part of the California Correctional Health Care Services ('CCHCS'), and 'receives, reviews, and maintains all health care appeals/grievances accepted for the final (headquarters) level of review in the inmate health care appeals/grievance process, and renders decisions on such appeals/grievances.'" *Martinez v. Davey*, 2021 WL 3772004, at *3 (E.D. Cal. Aug. 25, 2021), *report and recommendation adopted*, 2021 WL 4480498 (E.D. Cal. Sept. 30, 2021).

This Court's review of the Headquarters' Level Response for RJD HC 18001741 shows that it addresses only those issues Plaintiff identified in his original May 11, 2018 CDCR 602 HC grievance. *See* ECF No. 88 at 152–53. The January 16, 2019 Headquarters' Level Response summarizes Plaintiff's grievance issues as:  1) stronger pain medication other than gabapentin; 2) a re-evaluation of his complaints of nerve pain; and 3) a request that the grievance be processed as an emergency. *See* ECF No. 88 at 145–147. Therefore, even if Plaintiff's inclusion of the "if I keep insisting he will take 'm all off" language in his October 26, 2018 appeal was sufficient to provide officials with "enough information … to take appropriate responsive measures" with respect to his retaliation claim against Dr. Santos, *see Griffin*, 557 F.3d at 1121; *Sapp*, 623 F.3d at 824, that claim was not properly exhausted. The PLRA requires "proper exhaustion" of available administrative remedies, which means inmates must comply "with an agency's . . . critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford*, 548 U.S. at 90–91; *Jones*, 549 U.S. at 218 ("[T]o properly exhaust … prisoners 'must complete the administrative review process in accordance with the applicable procedural rules,' [] –rules that are not defined by the PLRA, but by the prison grievance process itself.") (citing *Woodford*, 548 U.S. at 88, 90).

Plaintiff fares no better with respect to RJD HC 18002825, in which he again reported Dr. Santos's May 2018 decision to reduce his Gabapentin by 300 mg and "mention[ed]" his "recommend[ation]" that Plaintiff "not . . . ask for pain med[s]." *See* ECF No. 88 at 8; ECF No. 74-5 at 96. But further review of this grievance, like RJD HC 18001741, reveals that its nature was solely aimed at Plaintiff's efforts to address his pain, and specifically to increase his Gabapentin dosage, which by October 31, 2018, had been reduced to 1800 mg. *Id.* Thus, the "wrong for which redress was sought" in RJD HC 18002825 was Santos's decisions with respect to Plaintiff's medication and course of medical care, and not any purported act of retaliation on Santos's part. *Griffin*, 557 F.3d at 1121.

1   Finally, even if RJD HC 18002825 was sufficient to put prison officials on notice

2   of Plaintiff's retaliation claims, it nevertheless would not satisfy 42 U.S.C. § 1997e(a)'s

3   exhaustion requirement because it was rejected at the Institutional Level of Review on

4   November 13, 2018 and he didn't pursue it further.[21] *See* ECF No. 75-4, Ex. 11 at 94;

5   *see also* Cal. Code Regs., tit. 15 § 3999.226(g) (2019) ("Health care grievances are

6   subject to a headquarters' level disposition before administrative remedies are deemed

7   exhausted pursuant to section 3999.230. A health care grievance or health care grievance

8   appeal rejection or withdrawal does not exhaust administrative remedies.").

9   Based on this record, the Court finds that no genuine factual dispute exists to show

10  that Plaintiff properly exhausted his retaliation claims against Dr. Santos before filing suit

11  pursuant to 42 U.S.C. § 1997e(a). Therefore, Santos is entitled to summary judgment

12  with respect to these claims.

13  **b.   Merits**

14  Next, Santos contends that even if Plaintiff's *did* properly exhaust his retaliation

15  claims, no genuine dispute exists to show that Santos's treatment decisions were adverse,

16  motivated by any retaliatory intent, or failed to advance a legitimate penological goal. *See*

17  ECF No. 75 at 22–26. Santos acknowledges Plaintiff alleges Santos told him he would

18

19

20  [21] In his Motion, Santos notes that Plaintiff claims to have "never received a response to
    [HC 18002825] and failed to pursue the matter further." *See* ECF No. 75 at 21. Plaintiff

21  does not make this argument in his Opposition; but during his Deposition claimed he did
    file a retaliation grievance sometime in October, after Santos was no longer his PCP, but

22  did not "recall if it got to the third level." *See* ECF No. 75-4 at 59–60. Plaintiff surmised

23  that "it could have been that even though [he] sent it out, it never came back." *Id.* at 60.
    Santos's Exhibit 11, however, shows that HC 18002825 was rejected at the Institutional

24  Level on November 13, 2018, *see* ECF No. 75-4 at 94, and Plaintiff does not claim, or
    more importantly point to any further evidence in the record to show, that he appealed this

25  rejection, otherwise pursued HC 18002825 to the Headquarters Level of review, or that
    there was "something in his particular case that made the existing and generally available

26  [Headquarters Level Review] effectively unavailable to him." *Albino*, 747 F.3d at 1172;

27  *Marella*, 568 F.3d at 1028 (noting that to avoid summary judgment, Plaintiff must "provide
    evidentiary support to rebut defendant[']s[] [evidence] that he [did] not exhaust[.]").

28

discontinue his Gabapentin prescription altogether "if [he] complained again" after his daily dosage was reduced to 2400 mgs, *see* ECF No. 3 at 3; ECF No. 75-4 at 55–56, but argues "there is no evidence" that Santos did so "because [he filed] grievances." ECF No. 75 at 25. The Court agrees.

A prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives to the corrections system." *Silva v. Di Vittorio*, 658 F.3d 1090, 1104 (9th Cir. 2010), *overruled on other grounds, Richey v. Dahne*, 807 F.3d 1202, 1209 n.6 (9th Cir. 2015). Included among those rights is the right to file prison grievances without retaliation. *Id.* To prevail on a retaliation claim, however, a prisoner must show: (1) a state actor took some adverse action against the prisoner (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the prisoner's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009) (citation omitted).

### c.   Analysis

A careful review of the record before the Court shows that while Plaintiff claims Santos's decisions with respect to his medication were motivated by a desire to retaliate against him for "complaining," *see* ECF No. 75-4 at 56, and/or "submitting complaint[s] about inadequate medical treatment," ECF No. 1 at 4, he nevertheless fails to corroborate these conclusory allegations by pointing to any evidence in the record that might reasonably support them. *See Villiarimo v. Aloha Island Air., Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (noting that no "genuine issue [as to a material fact] [exists] where the only evidence presented in 'uncorroborated and self-serving' testimony.") (citation omitted).

As discussed with respect to Plaintiff's Eighth Amendment claims, the record before the Court, including Plaintiff's own deposition testimony, medical records, CDC 7362's and CDC 602 Health Care Grievances, as well as Dr. Santos's responses throughout the months of March through October 2018, is replete with evidence which

shows Santos, as well as a host of other RJD medical officials from nurses to a neurologist, timely and repeatedly responded to Plaintiff's multiple co-morbidities, continual reports of chronic pain, reported but medically unsubstantiated seizures, suicidal history and ideation, the side-effects of every formulary and non-formulary medication prescribed (including Gabapentin), as well as the potential for its abuse given his prior history, non-compliance, and repeated demands for a specific drug and at increasingly high dosage levels. No evidence of retaliatory intent can be reasonably inferred from this factual and undisputed record. *See Brodheim*, 584 F.3d at 1269 (holding a plaintiff must set forth evidence showing that his treating physician's chosen course of treatment decisions were medically unacceptable, or that his filing prisoner appeals "was the 'substantial' or 'motivating' factor behind the Defendant's conduct.").

Plaintiff alleges Dr. Santos just "didn't care," *see* ECF No. 1 at 4, ECF No. 3, but he also admitted during his deposition that he was "not sure," could "not recall the specifics," and did not remember exactly why Santos made the decisions he did with respect to his dosage and or need for Gabapentin in particular. *See* ECF No. 75-4 at 52–56. Plaintiff further acknowledged under oath that "if [he] ke[pt] complaining about the pain," while taking Gabapentin, he was simultaneously reporting it was "ineffective." *Id.* at 56.

Based on this record, the Court finds Plaintiff's First Amendment retaliation claim rests on mere speculation that Dr. Santos reduced and then decided to terminate his Gabapentin prescription either because he filed medical grievances or "because [he] was a convict and [] c[ould not] be trusted." *See* ECF No. 3 at 3. Without some evidentiary support, however, Plaintiff's conclusory allegations are simply insufficient to defeat summary judgment. *See e.g., Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014). Thus, because Plaintiff must "put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [Santos's] intent,'" but has not, Dr. Santos is entitled to judgment as a matter of law with respect to

1  Plaintiff's First Amendment claim. *Brodheim*, 584, F.3d at 1271 (quoting *Bruce v. Ylst*,

2  351 F.3d 1283, 1289 (9th Cir. 2003)).

3      Plaintiff also fails to address or rebut evidence proffered by Dr. Santos which

4  demonstrates his decision to taper and then discontinue Plaintiff's Gabapentin dosage

5  "reasonably advanced [the] legitimate correctional goal" of curbing prescription

6  medication abuse, dependency, and potential diversion within the prison. *See Brodheim*,

7  584 F.3d at 1269; ECF No. 8-1 at 3 ¶ 7; ECF No. 36-2 at 2–3 ¶¶ 3–7; ECF No. 75-4, Exs.

8  2–4 at 98–133. *See also Hicks v. Dotson*, 73 F. Supp. 3d 1296, 1305 (E.D. Wash. 2014)

9  ("The DOC has a legitimate penological goal in regulating prescription pain medication

10 to avoid drug abuse."); *O'Brien*, 2021 WL 960693, at *9–10 (rejecting prisoner's claims

11 that doctor's failure to immediately cite safety and security as a justification to taper his

12 Gabapentin in response to CCHCS's non-opioid pain management policy meant that the

13 discontinuation of the Gabapentin had "no penological interest."); *Joseph v. Clayton*, No.

14 3:19-CV-2139-GPC-RBM, 2020 WL 804863, at *7 (S.D. Cal. Feb. 18, 2020) (noting that

15 "reducing prescription drug abuse and drug addiction among the prison population" is a

16 legitimate penological interest) (internal quotation marks and citations omitted); *Miller v.

17 California Dep't of Corr. & Rehab*., 2018 WL 534306, at *18 (N.D. Cal. Jan. 24, 2018)

18 (taking inmate off medication "not appropriate for his medical condition also advances

19 the legitimate penological goal of reducing prescription drug abuse and drug addiction

20 among the prison population"); *Juarez v. Butts*, 2020 WL 2306850, at *11 (E.D. Cal.

21 May 8, 2020) (concluding that "even if staff was incorrect to conclude that [plaintiff]

22 intended to abuse his medication," the prison doctor's "assessment reflect[ed] a

23 legitimate penological interest in preventing drug abuse") (internal quotation marks and

24 citation omitted); *Townsen v. Hebert*, 2015 WL 5782036, at *4 (D. Nev. Oct. 2, 2015)

25 ("Courts have repeatedly recognized inmates' health and safety as legitimate penological

26 interests.") (citations omitted).

27      In fact, while Plaintiff denies ever "using drugs in prison," *see* ECF No. 88 at 5, he

28 admitted under oath that "other prisoners" have been known to hoard or sell narcotics,

and that while Gabapentin is not classified as a narcotic, it "does give you a mood change," and "kind of get[s] you high." *See* ECF No. 75-4 at 50; *see also Schultz*, 325 F. Supp. 3d at 1076 (noting that while prisoner "contend[ed] that he never tested positive for illegal substances during his twenty years in prison," he failed to dispute the existence of illegal drug use history in his medical files).

Based on this record, and even drawing all facts and inferences in Plaintiff's favor, the Court finds no jury could find Dr. Santos's course of care and treatment decisions did not reasonably advance a legitimate correctional goal. *See Brodheim*, 584 F.3d at 1269; *Miller*, 2018 WL 53406, at *17–18 (granting summary judgment with respect to medical retaliation claim because, even if pain medication was tapered after allegedly protected conduct, the prisoner nevertheless failed to "provide any competent evidence to dispute Defendants' evidence that the reduction and eventual elimination of the morphine reasonably advanced legitimate medical goals.").

For these reasons, the Court also finds Defendant Santos is entitled to summary judgment with respect to Plaintiff's First Amendment retaliation claim\.

### 3.   *Qualified Immunity*

Finally, Dr. Santos claims that because Plaintiff "does not have a clearly established right to a specific course of treatment," he is entitled to qualified immunity with respect to Plaintiff's Eighth Amendment claims. *See* ECF No. 75 at 26–28.

On summary judgment, courts generally resolve questions of qualified immunity through a two-pronged inquiry. *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). The first prong "asks whether the facts, '[t]aken in light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right[.]'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second prong "asks whether the right in question was 'clearly established' at the time of the violation." *Tolan*, 572 U.S. at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)); *see also Sharp v. Cnty. of Orange*, 871 F.3d 901, 909 (9th Cir. 2016). The court is not required to address the prongs in any particular order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("[T]he judges of the district

courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

However, where, as is the case here with respect to Plaintiff's Eighth Amendment claims, "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201; *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[The better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all."). Because the Court has found no genuine dispute with regard to Plaintiff's Eighth Amendment inadequate medical treatment claims against Dr. Santos, it need not also decide whether Santos would be entitled to qualified immunity.

## III.   Conclusion and Order[22]

For all the reasons discussed, the Court **GRANTS** Defendant Santos's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (ECF No. 75) and **DIRECTS** the Clerk of the Court to enter a final judgment in favor of Dr. Santos on all claims and to close the file.

**IT IS SO ORDERED**.

Dated: November 4, 2021

_____

Honorable Barry Ted Moskowitz
United States District Judge

---

[22] In support of his Motion for Summary Judgment, Defendant Santos requests that the Court take judicial notice of Exhibits 2-4 attached to the Declaration of Lyndsay R. Crenshaw: (a) CCHCS Pain Management Guide Part 2; (b) CCHCS's April 18, 2019 Memorandum regarding Gabapentin; and (c) CCHCS's Health Care Department of Operations Manual § 3.5.4(c)(1)(B). *See* ECF No. 75-1. The Court **GRANTS** Defendant's Request for Judicial Notice. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 (9th Cir. 2004) ("We may take judicial notice of a record of a state agency not subject to reasonable dispute.").